GENERAL CADWALADER, The (HEPPARD v.). See Case No. 6,390.

## Case No. 5,307.

### The GENERAL CASS.

[Brown, Adm. 334;[1] 5 Am. Law T. Rep. 12; 4 Chi. Leg. News, 89.]

District Court, E. D. Michigan. June, 1871.

JURISDICTION—NAVIGABLE WATERS — CHARACTER OF VESSEL—LIGHTERS—LIEN FOR TOWAGE IN HOME PORT.

1. Saginaw river, though wholly within the state of Michigan, is a public navigable stream, and within the admiralty jurisdiction.

[Cited in The Illinois, Case No. 7,004; McMarren v. Kean, Id. 8,901; Murray v. Ferry Boat, 2 Fed. 89.]

2. If the business or employment of a vessel appertain to travel, or trade and commerce on the water, it is subject to the admiralty jurisdiction, whatever may be its size, form, capacity, or means of propulsion.

[Cited in Raft of Cypress Logs, Case No. 11,527; The Ella B., 24 Fed. 50⁴; The F. & P. M. No. 2, 33 Fed. 512; Seabrook v. Raft of Railroad Cross-Ties, 40 Fed. 593; The City of Pittsburg, 45 Fed. 701; The Paradox, 61 Fed. 861.]

3. Such jurisdiction extends to lighters employed in carrying lumber out to vessels lying in deep water.

[Cited in Salvor Wrecking Co. v. Sectional Dock Co., Case No. 12,273; Seabrook v. Raft of Railroad Cross-Ties, 40 Fed. 597; The Starbuck, 61 Fed. 503.]

[See The Ann Arbor, Case No. 407.]

4. The fact that these lighters are not enrolled or licensed does not affect the question of jurisdiction.

5. A lien attaches for towage services rendered in the home port.

Libel for towage, by George P. Felcher, owner of the tugs Challenge and Kate Felcher.

The third article of the answer of William Mitchell, claimant and owner of the scow, alleged, "That the said scow is a mere float or lighter, has no means of propelling, neither sails, anchors nor chains; has never been enrolled or licensed, and is employed solely in the navigation of the Saginaw river to float lumber thereon over the bar and shallows, in tow of tugs and steamers;" and the jurisdiction of the court was therefore denied. Libellants excepted to the said third article and moved to expunge the same. Hearing upon the exception and motion.

---

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

H. B. Brown, for libellant.

Wm. A. Moore, for respondent.

LONGYEAR, District Judge. The question of jurisdiction raised by the third article of the answer, is:

1. As to the waters upon which the service was rendered, the Saginaw river being wholly within a state, and a tributary merely, emptying into the lakes but constituting no part of them, or of their connecting waters.

2. As to the character of the craft, the same being a mere float or lighter, with no means of propulsion of its own, etc.

3. As to the necessity of enrollment and license in order to bring a vessel under the admiralty jurisdiction of this court.

First. Since tide water has been ignored as the test of admiralty jurisdiction under the constitution and the judiciary act of 1789 [1 Stat. 73], the act of 1845 [5 Stat. 726], purporting to extend a limited jurisdiction in admiralty over the lakes and their connecting waters, no longer has any influence in determining the extent of admiralty jurisdiction over the northern and northwestern lakes and rivers. The test of such jurisdiction as to the waters over which it extends, now is, that they are public navigable waters. The Genesee Chief, 12 How. [53 U. S.] 443; The Eagle, 8 Wall. [75 U. S.] 25. Those waters are navigable in law which are navigable in fact, and those are public navigable waters which are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. The Daniel Ball, 10 Wall. [77 U. S.] 557.

That Saginaw river, from Saginaw City to its mouth, upon which the towage services are claimed to have been rendered, fully answers the description above given, there is and can be no dispute. It is therefore public navigable water, and is clearly within the admiralty jurisdiction of this court.

Second. The true criterion by which to determine whether any water craft, or vessel, is subject to admiralty jurisdiction, is the business or employment for which it is intended, or is susceptible of being used, or in which it is actually engaged, rather than its size, form, capacity, or means of propulsion. The Kate Tremaine [Case No. 7,622]; 1 Conk. Adm. 27–30; Ben. Adm. §§ 217–221.

A test is to be applied here similar to that above applied in determining the extent of admiralty jurisdiction over the waters upon which vessels are used. If the business or employment of vessels appertain to travel, or trade and commerce on public navigable water, it is sufficient, and the jurisdiction attaches. This test is based upon principle, while any test based upon size, form, capacity or means of propulsion must, from the nature of the case, be entirely arbitrary. The former is also certain and reasonably well defined, and hence, if generally adopted must have the same application everywhere, while the latter admits of no well defined line of distinction, and, being arbitrary in its application, would be subject to the mere caprice of the different judges by whom it is applied.

The lumber of the Saginaw valley, as an article of commerce, passing down and out of the Saginaw river, on its way to the lumber marts of other states and countries, constitutes one of the greatest interests of its kind in the world, and in its transportation employs vessels of all sizes, forms and capacities, and all kinds of propelling power, from the insignificant scow, like the one here in question, to the largest sized vessels and steamers that float the lakes. The business and employment of each, irrespective of the accidents of size, form, capacity or propelling power, appertains equally to trade and commerce, and all are therefore equally subject to the jurisdiction of this court.

Large sized vessels cannot pass out of Saginaw river with full loads on account of a bar or shoal at the mouth, where it empties into Saginaw Bay. Such vessels, consequently, after taking on part of a cargo in the river, pass out over the bar, and then complete their loading from scows or lighters, upon which it is brought to them. These lighters seldom belong to the vessels, but generally to either the lumber dealers upon the river, or—which is more often the case, and is understood to be the case here—to persons who own neither vessel nor lumber, but who make this species of transportation their principal or sole business. They have no propelling power of their own, but depend entirely upon being towed to and fro by tugs and steamers. The business and employment, therefore, of these scows consisting, as it does, in the transportation of lumber, an article of commerce, a part of the way on its road to market, by water, clearly appertains to trade and commerce, and thus far, at least, they are clearly within the jurisdiction. But it is said that because they have no propelling power of their own, they are not themselves engaged in navigation, and are therefore not within the jurisdiction. I do not think this proposition a sound one, for various reasons.

The application of steam to navigation has upset many of the old theories upon which admiralty jurisdiction was based, and materially modified others. Before this event, commerce upon the water depended almost exclusively upon the utilization of the wind, by means of masts and sails. When steam power made its advent upon the water, it was as a stranger thrust in upon the maritime family, and the admiralty courts looked at it askant, and hardly knew where to place it, or whether to recognize it at all. But so rapidly did it gain in favor, and so soon did it obtain a commanding position in the commerce of the world, that it was speedily taken in and domesticated in the admiralty fold, without further question, let or hin-

drance, on account of its not being graced with the traditional masts and sails, or of its being the mere invention of man, to take the place of the free winds of heaven.

The use of steam upon the water soon wrought other innovations upon ancient usage, among which was the use of vessels commonly called barges, with no propelling power of their own—neither the traditional masts and sails, nor steam—having capacity merely, and none of the means of navigation except the ordinary steering apparatus, depending for locomotion upon steam power, it is true, but applied by means entirely outside themselves. Commerce upon the lakes and rivers of this country is now largely carried on in this class of vessels; and it is perhaps safe to assume that nearly one-half the vast carrying trade in iron, copper, grain and lumber, upon the great lakes and their tributaries, is now carried on in them; and they are rapidly increasing in numbers and capacity.

This character of craft was also a stranger in the maritime family, and at first was also looked upon with distrust by the admiralty courts. But so prominent a place do these vessels now occupy, that like their progenitor, the steamboat, of which they are in fact, a mere excrescence, they too must be, as they already in fact have been, taken in and domesticated in the admiralty fold. And this jurisdiction is maintainable on principle, as well as from necessity. There is certainly no reason why it is not navigation, all the same whether a vessel is propelled by a steam engine placed within her hull, or by the same engine by means of a tow line. It is, in fact, one of the revolutions wrought by the use of steam, that it has abolished all distinctions as to propelling power in determining admiralty jurisdiction.

But these barges and the scows upon Saginaw river, of which the one here in question is a sample, are equally engaged in a business or employment appertaining to commerce, and each is equally dependent upon the same means of locomotion. The service rendered by each does not differ one iota in kind, but only in degree or extent. The service being maritime, as we have seen, no criterion of jurisdiction founded upon the mere accident of the degree or extent of it, can be recognized. No such line can be drawn without legislation, however desirable it may be to rid the court of cases involving small amounts, and concerning petty crafts. Hence, if jurisdiction is denied as to the scows, it must be as to the barges, and being recognized as to the latter, as we have seen it is, it must be as to the former.

Another consideration upon which some emphasis may be laid, arises out of the fact that water crafts of the description here under consideration, are recognized, by necessary implication, as vessels, by, and as such subject to, the navigation laws of congress.

By the act of July 20, 1846 (9 Stat. 38), "canal boats without masts or steam power," are expressly exempted from payment of the hospital tax required of registered, or enrolled and licensed vessels, and also from liability to attachment for seamen's wages. If such boats, "without masts or steam power," were not included in the general provisions of law requiring the tax, or of the maritime law making them subject to attachment, what was the necessity of the exemption?

By section 1 of the act of March 2, 1831 (4 Stat. 487), "any raft, flat, boat or vessel of the United States, entering otherwise than by sea, at any port of the United States on the rivers and lakes on the northern, northeastern, and northwestern frontiers," are expressly exempted from levy of custom house fees from and after a certain then future date. If such craft were not subject to such levy under the general laws in relation to vessels, then certainly there was no necessity for the exemption, or, at all events, there would have been no sense in postponing such exemption to a future day.

So, too, by a provision at the end of the liability limitation act of March 3, 1851 (9 Stat. 636), it is enacted that "this act shall not apply to the owner or owners of any canal-boat, barge, or lighter, or to any vessel of any description whatsoever used in rivers or inland navigation." Now, the general terms used throughout the act are, "ship or vessel." Here is a clear implication, therefore, that congress understood "ship or vessel" to include the craft named in the proviso.

See, also, section 47 of the act of February 28, 1871, "to provide for the better security of life on board of vessels," &c. (16 Stat. 454), in the provisions of which water craft of the kind here under consideration are expressly included. See, also, Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1; The Kate Tremaine, above cited; Ben. Adm. §§ 219, 220.

I am aware that there has been some wavering on the part of some of the courts upon this question of jurisdiction in such cases; and the court was cited to several decisions, especially in the cases of Jones v. Coal Barges [Case No. 7,458], and Thackarey v. The Farmer of Salem [Id. 13,852], seeming to bear against the conclusions above arrived at. In the Case of the Coal Barges, it is to be observed that the things which were called "barges" were mere temporary boxes, in which coal was to be transported to its destination, and were then to be broken up and sold for lumber. They were, to all intents and purposes, like the bales or boxes in which goods, wares, and merchandise are ordinarily transported, the only difference being in the mode in which the boxes were carried, being towed through the water by the vessel, instead of

being placed upon it—a very different case from the present. And in the case of Thackarey v. The Farmer of Salem [supra] it appears that the learned judge had announced his decision before he wrote his opinion, and from his acknowledged inability to draw a line upon which to base his decision, and from the dissatisfaction expressed by him as to his conclusions, one can hardly read the opinion without coming to the conclusion that if the opinion had been written first, the decision would have been the reverse of what it was. See 1 Conk. Adm. 28, 29.

Numerous cases might be cited in which the jurisdiction has been maintained in cases in many respects similar to this one. See especially The D. C. Salisbury [Case No. 3,694]; The Flora [Id. 4,878]; The Canton [Id. 2,388]. I think the weight of argument is entirely with this latter class of cases.

Third. Admiralty jurisdiction exists and is exercised in the United States, under and by virtue of the constitution and the judiciary act of 1789, and independently of the navigation laws of congress. It therefore has no regard to registry, or enrollment and license. The notion that upon the lakes and rivers the jurisdiction depended upon registry or enrollment and license, was derived entirely from the provisions of the act of 1845, by which the jurisdiction was expressly limited to vessels of that character, and the clause of section 9 of the act of 1789 relating to "seizures under the laws of impost, navigation and trade of the United States," both of which—the said act of 1845 and the said seizure clause—are now obsolete. The Genesee Chief, 12 How. [53 U. S.] 443; Jones v. The Coal Barges [supra]; The Flora [supra]; The Eagle, 8 Wall. [75 U. S.] 15. It is, therefore, a matter of indifference whether the scow in this case was enrolled and licensed or not, so far as the question of the jurisdiction here invoked is concerned.

Another question was raised and discussed at the hearing, which, although not involved in the exceptions and motion, yet for the purpose of disposing of all preliminary questions, will now be considered. The learned advocate for the respondent contends that the towage services having been rendered in the home port, no lien attaches, and that, therefore, this court has no jurisdiction in rem.

I do not consider the position a sound one. So complete seems to have been the acquiescence of the bar in the doctrine that a lien for towage does attach under such circumstances, that the question does not appear to have been raised, or, if raised, that the decision of it does not seem to have been considered of sufficient importance to be reported. It has been assumed, however, by high authority, that such lien does attach. See 1 Conk. Adm. 28, note; The

Sarah Jane [Case No. 12,349]; The Kate Tremaine [Id. 7,622].

The inclination of the courts is not to circumscribe the class of maritime contracts on account of which a lien shall be held to attach, but rather to enlarge it. It is now well settled that a lien attaches for contracts, in the home port, of affreightment, for pilotage, for seamen's wages, and for wharfage, and why not for towage? It has the same elements as the others, and the same tests are applicable to it—it is to be performed on maritime waters, and in relation to a business appertaining to trade and commerce. The Canton [supra]; De Lovio v. Boit [Case No. 3,776]; The Belfast, 7 Wall. [74 U. S.] 624, 637; New England Ins. Co. v. Dunham, 11 Wall. [78 U. S.] 1.

But, it is said, no lien attaches by the maritime law to contracts for supplies and repairs furnished in the home port, and it is asked why should it attach to the contract for towage made in the home port? The question is a pertinent one; but it may be asked as well in regard to the contracts of affreightment, for pilotage, and for seamen's wages. The answer to the question must be that there is no reason for the discrimination. But I think that answer furnishes an argument rather in favor of abolishing that unjust discrimination against contracts for supplies and repairs, than for extending it to other subjects; and I expect, at no distant day, to see it wiped out by act of congress or otherwise.

It is also said the amount involved is small, and the vessel is a petty craft, and if this jurisdiction is entertained, it will bring upon the court a flood of petty cases. I do not apprehend any serious embarrassment from this source. Nevertheless, the full and complete answer to the suggestion is, as has been already intimated, that no line can be drawn defining just where jurisdiction shall begin, and just where it shall end, in respect to the matters named, without legislation.

The exception to the third article of the answer is sustained, and the motion to expunge the same is granted. Motion granted.